IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Salissou Karim-Seidou, | Case No. 3:09 CV 51 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY* |
| Hospital of Saint Raphael, | |
| Defendant. | |

### INTRODUCTION

This is an employment discrimination case brought under 42 U.S.C. § 2000e ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12111 ("ADA"), by one of Defendant's former employees who alleges he was terminated because of his race, national origin, and an alleged disability. He also alleges his former coworkers harassed him because of his race, and that harassment produced a hostile work environment. Defendant counters that Plaintiff, a probationary employee, was terminated solely for poor performance, and denies any of its employees made racially derogatory comments or otherwise harassed him. The parties litigated these claims during a two-day bench trial at which Plaintiff represented himself *pro se*. At the close of trial, this Court dismissed Plaintiff's hostile work environment claim, finding he had not submitted sufficient evidence, and that even if his allegations were accurate, the alleged actions would not amount to a hostile work environment (Doc. 60). Having heard and reviewed the trial testimony and evidence, this Court now addresses Plaintiff's remaining claims.

---

*The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

**BACKGROUND**

Defendant is a 511-bed acute care teaching hospital located in New Haven, Connecticut, and is now owned by Yale-New Haven Hospital. Among its various units is the pathology department, which processes approximately 20,000 surgical specimens annually for making diagnoses. In May 2007, Defendant was understaffed in the histology lab, which is part of the pathology department, and in particular needed another histotechnologist. Among other duties, histotechnologists cut tissue samples and prepare slides that are studied by pathologists in making diagnoses. Defendant advertised the opening internally and externally, received several applications, and ultimately narrowed the field to three finalists. Gayle Barricelli, the manager of the pathology department, testified at trial that the ideal candidate for the position would have been an experienced histotechnologist who worked quickly and accurately.

Barricelli and other staff members interviewed the three finalists, none of whom worked for St. Raphael at the time. Among the finalists were Plaintiff Salissou Karim-Seidou, an African American male, and two women, one Caucasian and one Asian American. All three were experienced histotechnologists, but Plaintiff was the most experienced. During the interview process, Plaintiff met with Barricelli, Mozetta Byrd (the lab supervisor who would become his direct manager), several pathologists, and two histotechnologists already employed by Defendant, Richard Clark and Carrie Dessart. It was undisputed at trial that Plaintiff and Defendant's staff got along well during the interview, and that all Defendant's employees who met Plaintiff were impressed with his credentials and recommended Plaintiff be hired. Ultimately, the hiring decision was entrusted to Barricelli, who formally offered the job to Plaintiff on May 3, 2007. Plaintiff accepted the offer, but continued working a full-time schedule in the lab at which he worked previously for the duration of his employment with Defendant.

2

Plaintiff began working full-time at the hospital on May 29, 2007, which is when his 90-day probationary period began. He testified at trial that he understood he could be terminated at the end of his probationary period if "things did not work out." Peggy Dillinger, who was the director of employee relations at the hospital during Plaintiff's tenure, testified it was not unusual for probationary employees to be terminated. Further, Barricelli noted that her practice was to terminate an employee by the end of a probationary period if he or she did not meet expectations.

Plaintiff received orientation specific to the histology lab's policies and procedures, which included instructions for labeling slides. He was instructed not to "pre-label" or "pre-write" slides per a hospital policy aimed at reducing diagnostic errors. Pre-labeling slides means writing patient-identifying information on several slides before actually putting tissue on the slide. Barricelli, Clark, and Dr. Nhu Ngo, a pathologist at the hospital, each testified that pre-labeling in the past had resulted in misidentified diagnoses. These errors led to the policy against pre-labeling.

Following orientation, Plaintiff began working in the histology lab alongside Clark and Dessart under Byrd's supervision. Clark testified he and Dessart had the day-to-day responsibility for training Plaintiff. He also testified he instructed Plaintiff on the hospital's slide labeling procedures, tissue cutting procedures, and on how to use the lab's equipment, which was different in some instances than what Plaintiff used earlier in his career. Clark further testified Plaintiff at times resisted this new training, preferring to pre-label slides as he had during his previous employment in another lab. Clark and Barricelli both testified they witnessed Plaintiff pre-labeling slides after he had been instructed not to do so, which Plaintiff denies.

Beginning in June and continuing through July 2007, several witnesses (including Barricelli and Ngo) testified that the number of labeling errors made in the histology lab were increasing. Barricelli testified the lab historically did not have a problem with mislabeled slides. All witnesses

3

admitted at trial, however, that each histotechnologist would make occasional mistakes. When mistakes were noticed, the person who caught the mistake either told the histotechnologist directly, or would tell one of the managers, Byrd or Barricelli. The way someone would identify which histotechnologist made the error was to recognize handwriting. The writing was a number written in pencil on the back of the slides that should correspond to the printed number and patient's name on the front of the slide. Testimony showed there were only four people who would have labeled slides, each with recognizable handwriting. Regardless of who made the errors, Defendant's expectation was that the histotechnologist would learn from the mistake and not repeat it.

Both Clark and Barricelli testified they were able to attribute the increase in lab errors to Plaintiff's pre-labeling of slides. Both further testified they repeated the hospital policy on slide labeling to Plaintiff to avoid the labeling errors. Barricelli testified she spoke with various members of the department, including pathologists who analyzed Plaintiff's slides. In an e-mail dated July 12, 2007 (Ex. 215), Barricelli asked the pathologists to inform her of "any cases that are mislabeled . . . or are of inadequate quality" so that she could "follow up with histology." She also began raising her concerns with the human resources department in early July 2007. Barricelli admitted neither she nor Byrd kept a comprehensive record of who made what mistakes during that period, but that when she was faced with an apparent increase in errors, she endeavored to keep track of them informally.

The pathologists who received and analyzed the slides from the lab, in particular Drs. Ngo and Ilsong Hahn, grew concerned with the increase in labeling errors. Ngo testified that although the pathologists did not expect perfection from the histotechnologists, they would not tolerate "repeated mistakes" after they had "tried to get somebody to take measures to minimize mistakes." They testified to having identified by handwriting Plaintiff as the histotechnologist making the labeling errors, and they informed Byrd or Barricelli about the major mistakes, which they expected would be

4

corrected and not repeated. Over the months of June and July, however, the errors persisted. At a meeting, Ngo asked the other pathologists whether they had similar experiences with Plaintiff -- according to Ngo, all of them had seen errors committed by Plaintiff and had gone to Byrd or Barricelli in an effort to have Plaintiff comply with hospital policy. The pathologists informed Barricelli of their conversation and their concerns. No records were kept of this meeting.

Upon hearing from the pathologists, Barricelli informed the human resources department of her concerns and recommended that Plaintiff's employment be terminated during his probationary period. In an e-mail dated August 2, 2007 (Ex. 206), she catalogued her concerns for Dillinger:

> After two months of employment, our concerns regarding [Plaintiff] continue to exist. I have closely monitored, with the assistance of the pathologists, the quality of the work currently produced by the entire Histology section. He is not the only histotech with quality/labeling issues, but he is responsible for most. In addition, the appearance of a new type of labeling error, not seen prior to his employment, is of great concern. All and any errors have been discussed with each employee.
>
> Pathologists also have great concern regarding his reaction when he is approached. He definitely does not take constructive criticism well . . . . In summary, all the pathologists are very unhappy with him and his performance. . . . I personally feel his employment should be terminated without much further delay.

When the errors continued, the pathologists held a second meeting, after which they recommended to Barricelli that Plaintiff be terminated because he had not taken the corrective measures asked of him and they feared his "mistakes would eventually lead to harming a patient." Ngo testified Plaintiff's race and national origin played no part in their recommendation. No records were kept of this meeting either, and it is unclear on what date the meeting occurred. Barricelli testified the pathologists told her they would no longer allow Plaintiff to cut tissue and prepare slides.

Plaintiff's immediate supervisor, however, did not share the view that Plaintiff was performing unsatisfactorily. Byrd testified she thought Plaintiff had been doing a good job, and in her view, Clark made more errors than Plaintiff. She also testified she did not have the opportunity to give a formal

evaluation of Plaintiff to Barricelli because he was terminated before the expiration of his probationary period and while she was on vacation. Barricelli admitted Byrd had expressed her disagreement with Barricelli's and the pathologists' assessment at earlier stages during Plaintiff's tenure, but stated that Byrd was out on vacation when the pathologists informed her they would no longer allow Plaintiff to cut tissue. (Defendant's records indicate Byrd took nine days of vacation during Plaintiff's two-month employment, and was on vacation August 8–10, returning Monday, August 13 -- Plaintiff was terminated August 9.) Byrd did admit, however, that she was not aware of the two pathologist meetings. Barricelli further testified that had Byrd been present when the pathologists gave their ultimatum, she would have "been on board with [the] decision."

On August 7, Plaintiff arrived at work with what he thought was a large pimple on his neck. Clark was the only other histotechnologist working that day, and he encouraged Plaintiff to go to the emergency room to have it checked out. In the emergency room, Plaintiff was diagnosed with bacterial folliculitis for which he was prescribed an antibiotic. Plaintiff returned to work that day, but called out sick the next day, August 8. He returned to work on August 9. At no point did Plaintiff indicate to anyone at the hospital his condition would prevent him from working or affect his ability to work, nor was he told by anyone he could no longer work in the lab because of this condition.

Ultimately, Plaintiff was fired on August 9. He met with Dillinger and Barricelli, who informed him he was being terminated effective immediately due to poor performance. Both Dillinger and Barricelli testified Plaintiff's race, national origin, and bacterial folliculitis had no impact on the decision to terminate his employment. His direct supervisor, Byrd, was on vacation and did not learn of Plaintiff's termination until her return on August 13. She played no role in Plaintiff's termination.

**STANDARDS OF REVIEW**

To prevail on a claim of race and national origin discrimination under Title VII, a plaintiff must "prov[e] by the preponderance of the evidence a prima facie case of discrimination." *Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 838 (2d Cir. 1996). If the plaintiff makes this showing, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection [or termination]." *Id.* Then, if the defendant can provide a legitimate, nondiscriminatory reason for the termination, the plaintiff must "have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

To establish a prima facie case of discrimination under the ADA, a plaintiff must establish "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Race and National Origin Discrimination**

• *Prima Facie Discrimination*

Employers may not "intentionally discriminat[e] against an employee because of that employee's 'race, color, religion, sex, or national origin.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 445 (2d Cir. 1999) (quoting 42 U.S.C. § 2000e-2(a)). To succeed on a claim for race and national origin discrimination under Title VII, Plaintiff's first task is to establish a prima facie case of racial or national origin-based discrimination. He must "show that [he] belongs to a protected class, that

7

[he] was qualified for the position, that [he] was discharged, and that [his] discharge occurred 'in circumstances giving rise to an inference of racial discrimination.'" *Hargett*, 78 F.3d at 838 (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989)). Although Plaintiff's burden is "minimal," *Bickerstaff*, 196 F.3d at 446, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff,'" *Hargett*, 78 F.3d at 838 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff easily satisfies three of the four requirements: (1) he belongs to a protected class because he is African American; (2) he was qualified for the position of histotechnologist by virtue of his prior experience; and (3) he was discharged from that position. The question here is whether his discharge occurred in circumstances giving rise to an inference of racial discrimination. As it is Plaintiff's burden to prove this inference, he "must produce evidence that [he] was discriminated against because of [his protected class]." *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 440 (2d Cir. 1999). Plaintiff must point to more than his subjective belief he was discriminated against, and an inference of discrimination cannot be drawn "from thin air." *See Bickerstaff*, 196 F.3d at 448; *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998).

Plaintiff has not met his burden here. While Plaintiff disagrees with Defendant's decision to terminate his employment during his probationary period, he was unable to present any evidence, aside from his own subjective beliefs, from which this Court could draw a reasonable inference of racial discrimination. Considering the entire record, this Court finds Plaintiff was not terminated due to his race or national origin.

Plaintiff sincerely believes he was qualified for the position, and that the labeling mistakes he made (though he does not necessarily admit he made any) were no different than the mistakes made by his coworkers Clark and Dessart, who were not fired. He admits, however, he knew he was a

8

probationary employee and that Defendant could fire him if Defendant believed he was not performing up to standards. The mere fact that Defendant fired a probationary employee who happens to be African American, without a showing of anything more, cannot give rise to an inference of racial discrimination.

Plaintiff insinuates he was fired while his direct supervisor, Byrd, was on vacation because Byrd, also African American, would not have agreed with the decision to terminate. But Byrd testified she was unaware the pathologists determined Plaintiff should no longer be allowed to work in the lab, and did not have the benefit of a full record.

Plaintiff also alleged both Clark and Barricelli at some point used racially derogatory language toward him -- Clark and Barricelli denied ever doing so, and no witness other than Plaintiff testified such comments were made. In denying Plaintiff's hostile work environment claim, this Court already found that these comments were not made. As such, those comments cannot give rise to an inference of discrimination.

- *Legitimate, Nondiscriminatory Reason for Termination and Pretext*

If Plaintiff had met his burden of proving a prima facie discrimination case, the burden would have shifted to Defendant to articulate "some legitimate, nondiscriminatory reason for the employee's rejection [or termination]." *Hargett*, 78 F.3d at 838. If Defendant did so, it would have been up to Plaintiff to "establish that the reason articulated by a defendant for termination of plaintiff's employment is a pretext and that race, in fact, did play a part in the decision to terminate by proving that 'similarly situated' white employees were treated more favorably than he." *Id.*

Here, Defendant convincingly presented legitimate nondiscriminatory reasons for Plaintiff's termination. Plaintiff was fired because of poor performance. In particular, his poor performance was continuing to pre-label slides, which violated hospital policy, even after being instructed on several

9

occasions that he needed to change how he labeled slides in order to avoid mistakes. Clark and Barricelli testified they witnessed Plaintiff pre-labeling slides on several occasions. Their testimony is buttressed by contemporaneous e-mails from Barricelli, which set out her concerns with Plaintiff's performance.

Most convincing, though, is the testimony by the pathologists, in particular Dr. Ngo. She testified she and the other pathologists know that histotechnologists made occasional mistakes -- what she and the others could not tolerate were the repeated mistakes despite instructions to the contrary. She and the others were able, on several occasions, to identify and tie to Plaintiff slides with labeling issues. The pathologists raised their concerns with Barricelli and Byrd, and were told that Plaintiff would be instructed in the proper procedures. When the mistakes continued, they advocated for Plaintiff's termination because those continued mistakes posed a serious risk to patient safety.

As both Barricelli and Dillinger testified, it was not uncommon for an employee to be terminated during his probationary period if he was not performing satisfactorily. Making repeated mistakes despite contrary instructions surely constitutes unsatisfactory performance. Defendant gave Plaintiff two months to "right the ship," and he did not. Thus, Defendant successfully articulated specific, legitimate, nondiscriminatory, and non-pretextual reasons for terminating Plaintiff's employment. And Plaintiff points to no evidence showing any similarly situated white employees were treated more favorably.

In addition, the circumstances surrounding Plaintiff's termination show Defendant would be entitled to what is known as the "same actor" inference. That is, Plaintiff was hired and fired by the same individual, Barricelli, within a short period of time -- two months. In these circumstances, a defendant is entitled to an inference that "discrimination was not a determining factor for the adverse action." *See Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004); *Grady v.*

10

*Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  Although the same actor inference is just that, an inference, and is not dispositive of Plaintiff's claims, it is unlikely under these circumstances that Barricelli would have fired Plaintiff because of his race or national origin.

In fairness to Plaintiff, it is understandable for him to question why he was fired without the involvement of his direct supervisor, who had told him he was doing a good job.  Likely, it would have been the wiser to include Byrd on the decision.  But this alone does not show Plaintiff was fired because of his race or national origin.

**Disability Discrimination**

To establish a prima facie case of discrimination under the ADA, a plaintiff must establish "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

Plaintiff did not establish a prima facie case of disability discrimination because he presented no evidence at trial in support of this claim.  Although Defendant is subject to the ADA and Plaintiff is qualified to perform the essential functions of his job, his temporary infection does not qualify as a disability under the ADA, and there is no evidence his termination had anything to do with his "bacterial folliculitis."  It did not impair his ability to perform his job or any other major life activities, and was not perceived by Defendant as substantially limiting Plaintiff's activities.  *See* 42 U.S.C. §§ 12102(2) & 12102(3).

## CONCLUSION

Plaintiff's race and national origin-based discrimination claim fails because he did not show race and national origin played any role in his firing. Even if this Court found an inference that Plaintiff was fired because of his race or national origin, Defendant convincingly showed he was terminated for a legitimate, non-pretextual, nondiscriminatory, performance-based reason. Plaintiff's disability claim fails because his case of bacterial folliculitis is not a covered disability, and even if it was there is no evidence his infection played any role in Defendant's decision to fire him. In short, the termination of Plaintiff's employment did not violate the law.

IT IS SO ORDERED.

                                                  s/ *Jack Zouhary*
                                                JACK ZOUHARY
                                                U. S. DISTRICT JUDGE

                                                December 19, 2012